JOHN J. SHEA, *by his conservator*, MARION H. SHEA

*v.*

PORTSMOUTH.

*Hughes & Burns* and *Donald R. Bryant* (*Mr. Bryant* orally), for the plaintiff.

*Thomas J. Flynn Jr.*, city solicitor and *Upton, Sanders & Upton* (*Mr. Richard F. Upton* orally), for the defendant.

GOODNOW, J. The first count of the plaintiff's declaration is one for negligence. In it the plaintiff states that on December 23, 1947, he slipped and fell on the public sidewalk of Court Street in Portsmouth because of ice which had formed there as a result of water escaping from a hydrant and from a fire hose which had been attached to the hydrant on the previous day. The claim is based on the negligent use and maintenance of the hydrant and hose and also on the improper design, style, type and construction of the hydrant and hose. His cause of action in this respect rests on his allegations that the hydrant was a part of the water system of the defendant city and that in its operation of this system, the defendant was acting in a proprietary capacity.

It is conceded by the defendant that its water works system, as such, is a private business undertaking in the operation of which it does not act in the performance of a public corporate duty. *Lockwood* v. *Dover*, 73 N. H. 209, 213; *Shea* v. *Manchester*, 89 N. H. 547. The defendant claims as a matter of law that the hydrant in question was not a part of the water system but that in the use, maintenance and construction of hydrants, the city acted in a governmental capacity through the chief and board of engineers of the fire department of the city.

The hydrants of the defendant were not made a part of the water works system by any special legislation. The act under which the city was authorized to operate the water works (Laws 1891, *c.* 209) states that the city has acquired the stock of the corporation known as the Proprietors of the Portsmouth Aqueduct and empowers the city to "possess the rights, powers, privileges, franchises, and property of said Proprietors" in the same' manner as if the same had been originally granted to said city. The act creating the Proprietors of the Portsmouth Aqueduct in 1797 (6 N. H. Laws 465) states the corporate purpose as the "bringing [of] fresh water by subterraneous pipes into the said town of Portsmouth" and includes no statement of purpose or grant of power relating to fire prevention or the establishment of hydrants. The preamble of the 1891 act states that the public good requires that the works should be enlarged to enable the city "to afford better protection against fire" as well as an adequate supply of water for use of the inhabitants. The act also authorized the city, by ordinance, to "prevent the use of its hydrants and reservoirs by any person except those duly authorized by the board of water commissioners" (*s.* 11) in whom the act placed the control and manage-

ment (s. 4) and the power to construct and enlarge the works, establish rates, make regulations as to use and sell and purchase property (s. 8).

For many years prior to 1891, the general laws of the state provided that the selectmen of a town, being authorized by vote of the town, "shall appoint a chief engineer and assistant engineers, . . . who shall respectively have the powers and perform the duties of the chief and other firewards . . . and as a board shall have the powers and perform the duties of the board of firewards." (G. L., c. 106, s. 21). To the board of firewards was granted "control of all fire-engines, fire-hooks, hose, and all other implements designed or used for the extinguishment of fire" (s. 2) and the chief fireward was directed to "keep . . . in order all apparatus . . . and cause all cisterns and sources of water prepared for the fire department to be fully supplied and kept in order." (Id., s. 11). In 1882, this court had said in connection with the same statute that public hydrants were "sources of water" and were "a part of the machinery under the control and management of the engineers." Edgerly v. Concord, 62 N. H. 8, 20, 21. The city councils of the defendant, having the powers of towns (G. L., c. 44, s. 2), established a fire department prior to 1891 and provided for the appointment of a chief engineer and assistant engineers. (See ordinance of city of Portsmouth adopted August 21, 1890).

Under the special legislation of 1891, c. 209, supra, the city was authorized to purchase and operate, through a board of water commissioners, an existing water works system to which were attached hydrants. The mention of better protection against fire in the preamble to that act granted no powers to the city beyond those already possessed and exercised by it under the general laws of the state. Section 11 of that act authorized the city to enact such ordinances as might be required to prevent pollution of the water and to prevent the use of hydrants by persons not authorized by the board of water commissioners. This section was intended to provide means by which the pollution and waste of water might be avoided. To accomplish this purpose, the act granted to the city the authority to prevent the use of hydrants except when authorized by the commissioners. This grant of authority to the city did not place the full control over the hydrants in the commissioners to the exclusion of the public officers in whom a duty of control and management had previously been placed by state law, but merely authorized the city, in the interests of avoiding pollution and waste,

to regulate the use of hydrants for purposes subsidiary and incidental to their primary use in extinguishing fires. The general law giving control and management of hydrants to the fire engineers was well established in 1891. The city councils had acted under that law in establishing a fire department and in providing for the appointment of engineers. Control in the fire engineers, as provided by the general law, attached to the hydrants in Portsmouth as soon as they were acquired by the city. There is no inconsistency in separating control of the hydrants from the general water system. "Though water commissioners . . . had the control and management of the water-works . . . their powers and duties did not conflict with the powers given by statute to the board of engineers, which included the control and management of the hydrants as sources of water for the extinguishment of fires." *Edgerly* v. *Concord*, 62 N. H. 8, 21. So far as the legislation of 1891 is concerned, it did not change the general law so as to relieve the chief and board of engineers of the fire department of the city of responsibility for the control and management of the hydrants.

The plaintiff contends that on the facts alleged in his declaration, the hydrant must be held to be an integral part of the water system and thus within the proprietary acts of the defendant, pointing out that the mains used to supply the hydrant were also used by the city in a private capacity to supply domestic consumers, that hydrants are used for the benefit of the whole system in flushing the mains and in testing pressures and mains, and that in this particular case, the actual labor in the operation and maintenance of the hydrants was performed by the employees of the same water works department which takes care of the rest of the system, and paid for by the city by transfer of funds to the water department.

A hydrant is not a water pipe or main. It does not contain water constantly but is equipped with a valve by means of which water may be let into the hydrant from the water main when needed and emptied from the hydrant when no longer required. It is a generally accepted fact that public hydrants are established and maintained principally for use in extinguishing fires. *Edgerly* v. *Concord, supra*, 20; *Morgan* v. *Village of Stowe*, 92 Vt. 338. There is no reason to assume that this hydrant was established and maintained principally for any other use. "The fighting of fires . . . is ordinarily a governmental duty." *Reynolds* v. *Nashua*, 93 N. H. 28, 29. The maintenance of hydrants for the principal purpose of fighting fires is similarly a governmental duty.

The mains, from which water was drawn into this hydrant when needed, were controlled and used by the city in supplying commercial users but the occasional drawing of water from the mains controlled by the city in a private capacity through a hydrant maintained for the governmental purpose of fire protection does not thereby transform the otherwise public character of the hydrant and make it subject to the same control as that of the private water system. Nor does the fact that a hydrant is capable of being used for the benefit of the whole system in flushing and testing change its primary purpose. Such uses are merely incidental to the principally designed use of the hydrant as a means of fire extinguishment. If the water works and thereby the city receives a minor benefit from such use, it cannot be said to be sufficient to change the primary purpose of the hydrant. "A governmental function does not lose its character by incidental advantages . . . developed in the work." *Reynolds* v. *Nashua*, 93 N. H. 28, 30.

The allegation that "the operation and maintenance of the hydrant was performed by the same department and the men taking care of the rest of the system" for the expense of which a sum was paid to the commissioners by the city does not place the control of the hydrant in the commissioners. The use of employees of a non-public department of a municipality on work otherwise public in nature does not destroy the essential nature of the work they are doing. Nor does the fact that the city deposits with the water works funds, presumably from moneys raised by general taxation, a sum for the required expenses in connection with the hydrants, indicate control of the hydrants by the commissioners. The responsibility for seeing that the work was done rested at the time of this accident with the fire engineers who had "the control of all . . . fire apparatus designed or used for the extinguishment of fire" (R. L., c. 175, s. 2) and with the chief engineer who was required by law to cause "all . . . sources of water . . . to be kept in order" (*id.*, s. 5). Who actually did the work required by these public officers and how they were paid does not affect the essential public character of the work here undertaken. "A municipal enterprise does not become a private one merely because the municipality is free to choose the manner of performing the work." *Fournier* v. *Berlin*, 92 N. H. 142, 144.

"A municipality is not liable for its conduct in executing a governmental undertaking . . . when the work is done by persons not under its control and direction." *Gilman* v. *Concord*, 89 N. H.

182, 184. The duties of the fire engineers of the defendant were defined by the general law and they were not subject to change by the defendant. In the construction and use of the hydrant and hose in question, the defendant was acting in a governmental capacity through the fire engineers. The city could neither direct their manner of use or maintenance of hydrants and hoses nor specify the nature of the design, style or construction of the hydrants or hoses. The engineers "were public officers, . . . and not under control or direction of the city. They were not agents or servants of the city in any such sense as to bind it by their acts or make it liable for their defaults." *Edgerly* v. *Concord*, 62 N. H. 8, 20.

The cases relied upon by the plaintiff depend upon the municipality acting in a proprietary capacity for their conclusions and are not in point in this case.

The plaintiff further claims that he possessed special rights in the site of the accident in that he was a member of the Portsmouth Lodge of Elks and as such was a part owner of the property of the Lodge abutting the sidewalk where the accident occurred. His declaration states that he had come out of the parking lot located on the lodge property to the public sidewalk and was walking westerly along the sidewalk at the time of the accident.

Assuming without deciding that the plaintiff had some ownership interest in the adjoining property as a lodge member, it is clear that he had gained access to the sidewalk from that property without difficulty or interference and was walking westerly on it, as a means of passage. If he possessed any special rights as an abutting landowner, such rights were not involved in the use he was making of the public sidewalk. At the time of his injury, he was exercising a public right of passage and not any special rights which he might have had as an abutting landowner. This right of passage is equal to and in no sense greater than that of any other member of the general public. *Cain* v. *Aspinwall-Delafield Co.,* 289 Pa. 535, 539.

The second count in the plaintiff's declaration is one for nuisance and alleges substantially the same facts as the negligence count. It stands on no better ground than that count. A nuisance arises from the use of property, either actively or passively, in an unreasonable manner. Neither the existence of the hydrant nor its use in general are alleged to have been a nuisance but rather the manner of use and construction of the hydrant and hose is claimed to have been improper, thereby creating the nuisance of ice upon the side-

walk. If a nuisance was created, it resulted from the unreasonable conduct of the fire engineers for whose actions the city is not responsible. "The fundamentals of the situation and the rule of law applicable thereto are not varied by calling [the situation resulting from the use or construction of the hydrant and hose] a nuisance." *Piasecny* v. *Manchester*, 82 N. H. 458, 459.

Neither count of the plaintiff's declaration states a cause of action. The demurrer of the defendant should have been sustained.

In view of the result reached, it is unnecessary to consider the two questions as to notice which were also transferred.

*Judgment for the defendant.*

All concurred.